IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| Amur Sp. z.o.o. and Krzystof Kędzierski, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **JURY DEMAND** |
| | ) | |
| FedEx Corp., | ) | |
| | ) | |
| Defendant. | ) | |

---

**COMPLAINT**

---

Plaintiffs, Amur Sp. z.o.o. and Krzystof Kędzierski, by and through their undersigned

counsel, state and allege as follows:

<u>**NATURE OF THE ACTION AND RELIEF SOUGHT**</u>

1.      Plaintiff Krzystof Kędzierski is an information technology (IT) specialist and

software developer.  From 1999 to 2011, Mr. Kędzierski, individually and later through his

business, Plaintiff Amur Sp. z.o.o. ("Amur"), invested extensive financial and non-financial

resources for little immediate return in a Polish company named Opek, controlled and majority-

owned by Marek Opinski.  In 1999 Mr. Opinski desired to transition Opek from a business

warehousing and logistics company into a courier business, and needed Mr. Kędzierski's

expertise to do so.  At Mr. Opinski's request, Plaintiffs handled all of the logistics required to

turn Opek into a successful courier company.

2.      Among their other contributions, Plaintiffs provided extensive IT, technical, and

strategic planning support to Opek and developed several versions of a software called "Kurier"

specifically integrated into and designed to grow Opek's courier business.  The Kurier software

controlled Opek's operations, customer information and invoicing, and payment functions, and was essential to the creation and success of Opek—without Kurier, Opek could not function as a courier business. As Opek expanded, Plaintiffs developed expanded and improved versions of the Kurier software. Mr. Opinski recognized Opek's dependence on the Kurier software and repeatedly promised that Amur and Opek were to grow and succeed together, and that when Opek became successful and was sold, Mr. Kędzierski would participate in the sale negotiations and the Kurier software would be sold along with Opek. Based on these promises, Plaintiffs agreed to provide services and software to Opek at below-market or no price for many years. With the help of Plaintiffs and the Kurier software, Opek became a successful courier business that operated fruitfully for several years and that was ultimately sold to Defendant FedEx Corp. ("FedEx") for many tens of millions of dollars.

3.      In 2011, FedEx began negotiating to acquire Opek. FedEx desired to expand its business into Poland and needed to acquire a company with its own software system to do so. This is due to the fact that FedEx does not have a single, global software system capable of running its international courier businesses; rather, FedEx relies on acquiring companies that already have operating systems in place. After an acquisition, FedEx uses that company's system to continue operating the courier business in that country.

4.      During the due diligence process, Mr. Kędzierski provided FedEx with detailed information about the Kurier software and FedEx became aware of the business agreements between Plaintiffs and Mr. Opinski. Despite FedEx's knowledge of the relationship and agreements between Plaintiffs and Mr. Opinski, FedEx excluded Plaintiffs from the negotiations, induced and/or conspired with Mr. Opinski to breach his agreements with Plaintiffs and to wrongfully exclude them from receiving any benefit from the sale of Opek, and wrongfully

2

caused Mr. Opinski to terminate Opek's relationship with Plaintiffs. Although FedEx did not acquire ownership of the Kurier software through its acquisition of Opek, it continues to use the Kurier software beyond its licensed right to do so.

5.      FedEx's actions have severely diminished the value of Amur and its ownership of the Kurier software. Mr. Kędzierski designed the Kurier software specifically for Opek's courier business, always with the understanding that the Kurier software would remain with Opek even if Opek was sold to a third party. The Kurier software went "hand in hand" with Opek, and has only limited value outside of Opek. Consequently, Plaintiffs have been unable to recoup the value of the more than 12 years of investments they put into developing the Kurier software and growing Opek, and FedEx has been unjustly enriched by its unlawful use of the software. Through this action Plaintiffs seek redress for FedEx's wrongful actions.

## PARTIES

6.      Plaintiff Amur Sp. z.o.o. is a business entity incorporated in Poland.

7.      Plaintiff Krzystof Kędzierski is a citizen and resident of Poland. Mr. Kędzierski is the Chairman and majority owner of Amur.

8.      Defendant FedEx Corp. is a corporation incorporated in Delaware with its principal place of business in Memphis, Tennessee.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) because it is a suit between citizens of Poland and a citizen of the United States, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

10.     Venue is proper in the Western District of Tennessee pursuant to 28 U.S.C. § 1391(b)(1) because Defendant FedEx has its principal place of business in Memphis, Tennessee.

In addition, Tennessee has an interest in this dispute because the acts alleged herein were directed and carried out by individuals employed at FedEx's principal place of business in Memphis, Tennessee, and many of the individuals and documents relevant to this dispute are located in Tennessee.

## FACTUAL BACKGROUND

**I.** **The Development of Opek and the Kurier Software**

11.     In 1999, Krzysztof Kędzierski began providing IT, technical, and strategic planning services to Opek, a Polish company controlled and majority-owned by Marek Opinski. Mr. Kędzierski's services were sought to help transition Opek's business from providing warehousing and logistics for business customers into a courier business, a business in which Mr. Opinski had no experience.

12.     In or around August 1999, Mr. Kędzierski entered into an agreement with Opek for the creation of a system that would provide the logistics for Opek's new courier business. Pursuant to that agreement, Mr. Kędzierski designed and built an entirely new IT system called "Kurier."  The Kurier software was unique in that it was designed to allow just one person to oversee and control the movement of parcels.  Mr. Kędzierski also implemented other technological improvements—including new hardware, printed labels (the first in Poland), and radio scanners—to help launch Opek's courier business.

13.     For his months of work in developing the entire Kurier system, Mr. Kędzierski received just PLN 20,000—a little under $6,000.  Mr. Kędzierski was also paid a small monthly fee for the provision of IT services that was calculated based on the number of computers on which the Kurier software was installed.  Mr. Kędzierski, however, was responsible for covering all other costs, including the costs of employing IT specialists and staff.  The small amount Mr.

Kędzierski was paid did not cover the extensive cost and effort put into designing, creating, implementing, and maintaining the Kurier software and the provision of other IT services by Mr. Kędzierski.  Mr. Kędzierski was not otherwise compensated for his provision of other services and advice.

14.     Opek was launched as a courier firm in December 1999.

15.     On December 20, 1999, Mr. Kędzierski met with Mr. Opinski regarding Opek's unexpectedly poor start as a courier company.  Mr. Opinski remarked that the only thing that was functioning properly so far was Mr. Kędzierski's Kurier software.  Mr. Opinski confirmed to Mr. Kędzierski that his plan for Opek was to expand the business and then sell it, and that to sell Opek in the future would require the Kurier software to be sold along with Opek.  Mr. Opinski thus proposed an agreement between Opek and Mr. Kędzierski whereby Mr. Kędzierski would take care of the logistics side of Opek, provide IT services, advise on cost-cutting measures, and provide strategic insight for little or no up-front cost, while Mr. Opinski handled the general business and financial aspects of Opek, and together they would make a profit later when Opek was sold.  Mr. Opinski promised that if and when Opek was sold, he would make sure that the Kurier software would be sold with it and that Mr. Kędzierski would participate in any such negotiations.  Mr. Kędzierski agreed, and a contract between Opek and Mr. Kędzierski was formed (the "1999 Agreement").

16.     Despite Mr. Kędzierski's full commitment to developing the courier business, Opek continued to struggle acquiring and maintaining business for several years.

17.     In or around June 2000, Mr. Kędzierski hired a full-time service technician at his own cost to provide additional services to Opek.  Mr. Kędzierski requested that Opek increase its payments to Mr. Kędzierski to cover these additional costs, but Opek refused because of Opek's

troublesome financial situation.  Mr. Kędzierski acquiesced, relying on Mr. Opinski's earlier representations that Mr. Kędzierski would make money later upon the success or sale of Opek and the Kurier software.  Thus, Mr. Kędzierski continued to invest labor and other non-financial and financial resources at his own expense into the success of Opek.

18.     In August 2000, Mr. Kędzierski entered into an agreement with Opek for a new, expanded version of the Kurier system, called Kurier-2.  To create and implement the Kurier-2 system, Mr. Kędzierski hired two new full-time programmers.  Additionally, Mr. Kędzierski hired three part-time programmers to create and manage new functionalities and applications for Opek's customers.  Mr. Kędzierski again covered the cost of these new employees in reliance on his 1999 Agreement with Opek, with little financial contribution from Opek.

19.     In 2001, Mr. Kędzierski established Amur, through which he would continue to provide IT services to Opek.  Mr. Kędzierski transferred ownership of the Kurier software to Amur as part of the company's capitalization.  The Kurier software was by far Amur's most significant asset.

20.     Opek began to see significant increases in the volume of parcels it was shipping and Amur became required to provide service to Opek from 6 a.m. to 1 a.m., 7 days per week. To handle the additional business, in 2001 Amur hired a second full-time service technician. Opek eventually agreed to increase its payments to Amur, but that increase covered only the costs of the two full-time service technicians.

21.     In 2003 Amur hired Mr. Kędzierski's brother as well as six other full-time employees—two service technicians, two programmers, one administrator in charge of marketing new IT functionalities and solutions, and one manager—to provide additional services to Opek.

22.     Plaintiffs still were not being fully compensated for the full value of their services, but continued to provide comprehensive IT, strategic planning, and other services to Opek in reliance on the 1999 Agreement and Mr. Opinski's promises of future recompense to be made upon the sale of Opek and the Kurier software.  Plaintiffs provided services to Opek under this arrangement until 2006.  Thus, for years Mr. Kędzierski worked closely with Mr. Opinski to develop Opek in consideration for Mr. Opinski's promise that, should Opek be sold, Mr. Kędzierski would reap benefits from the corresponding sale of the Kurier software or the acquisition of Amur.

23.     On or about October 4, 2006, Amur signed an agreement with Opek for a third version of the software: Kurier-3.  (Ex. 1, at 1 ¶ 4.)  Amur was paid PLN 600,000 (approximately $179,000) up front to develop Kurier-3.  Based on the 1999 Agreement, Amur agreed to provide Opek with a free license to use the Kurier-3 software unless and until Opek achieved a certain yearly sales amount or until Opek was acquired by a third party.  Amur also continued to be paid monthly for the provision of IT services, except the payment was no longer based upon the number of computers on which the Kurier software was installed, but rather was set at .85% of Opek's monthly sales.  Still, Amur covered the costs of hiring the additional personnel needed to provide service to Opek in continuing reliance on Mr. Kędzierski's 1999 Agreement with Mr. Opinski.

24.     Mr. Opinski and Mr. Kędzierski also specifically negotiated over the ownership of the Kurier-3 software.  Mr. Opinski desired to obtain ownership of the Kurier software, but Mr. Kędzierski adamantly rejected giving up ownership of the software to Opek or Mr. Opinski. Opek thus only ever obtained limited rights to use the software, and any future right to the Kurier-3 source code was explicitly repealed by a later license agreement for the subsequent and

final version of the Kurier software.  (*See* Ex. 1, at 2 ¶ 4 ("the Parties shall repeal the obligation

of providing the source code for the 'Kurier – version 3.0' software" once Opek receives the

license to use the fourth version of the Kurier software).)  At no time did Opek obtain any right

to alter or develop the Kurier source code, nor to distribute the software to third parties without

Plaintiffs' prior written consent.

25.    Opek continued to operate for several years, garnering some interest from

purchasers without any ultimate sale.  Mr. Opinski and Mr. Kędzierski thus shifted their focus to

developing plans to expand Opek's business outside of Poland.

**II.    <u>Kurier-4</u>**

26.    In 2009, Mr. Opinski and Mr. Kędzierski decided that a fourth version of the

Kurier software, Kurier-4, should be created to handle additional packages.  Kurier-4 was

designed to be flexible, such that it could be easily adjusted to work in countries other than

Poland, in order to allow Opek to expand its courier business to other countries.  Mr. Opinski and

Mr. Kędzierski thus began negotiations for a new agreement providing for the creation of Kurier-

4.  The parties concluded an initial agreement regarding the development of the Kurier-4

software in late December 2009.  (Ex. 1, at 1.)

27.    On or about December 8, 2010, Amur and Opek entered into a formal License

Agreement for the Kurier-4 software (hereinafter "2010 License Agreement"), attached hereto as

Exhibit 1.[1]  The 2010 License Agreement recognized the parties' close working relationship that

began in 1999.  (Ex. 1, at 1.)

---

[1] The document attached as Exhibit 1 is an English-translated version of the original document.

28.     The 2010 License Agreement provided that Amur "holds the copyrights to the [Kurier-4] Software" and that the Kurier-4 "source code … constitutes Amur's commercial secret." (Ex. 1, at Art. 3.)  The license provided to Opek for the Kurier-4 software and the Kurier-4 Data Warehouse in the 2010 License Agreement, like the license agreements for the previous versions of the software, was limited in several ways.  Under the 2010 License Agreement, Opek was prohibited from granting any further licenses or sublicenses or installing the Kurier-4 software without Amur's prior written consent.  Further, Opek was not permitted to "modify, develop or disseminate" the Kurier-4 software.  (Ex. 1, at Art. 5 ¶¶ 3, 4.)

29.     The 2010 License Agreement required Amur to provide Maintenance Services and Software Maintenance Services from October 1, 2011 through December 2015, during which time Opek was not permitted to terminate the service agreement or withdraw from receiving services from Amur.  (Ex. 1, at Art. 2 ¶ 5.)  For the provision of IT services through March 31, 2011, Amur was paid a monthly amount equal to .85% of Opek's sales for the month, minus the amount paid to Amur under the parties' separate Service Agreement, with a minimum monthly payment of PLN 60,000.  (Ex. 1, at Art. 7 ¶ 1.)  Once Amur provided a license to Opek for the Kurier-4 software, Amur was to be paid a flat .85% of Opek's monthly sales, again with a minimum of PLN 60,000.  (Ex. 1, at Art. 7 ¶ 4.)  These rates were significantly below prevailing market rates, and at most covered Amur's actual costs in providing these services to Opek.

30.     The 2010 License Agreement was to be executed in three stages, with the source codes for Kurier-4 being provided in the third stage of the agreement commencing in October 2012 if the preceding stages were completed. The 2010 License Agreement also specified additional amounts Opek would pay for the Kurier-4 source code and the Kurier-4 Data Warehouse source code in the third stage of the agreement.  (Ex. 1, at Art. 2 ¶¶ 1, 3.)  However,

due to the subsequent acquisition of Opek by FedEx, the parties never reached the stage at which

Amur was to provide Opek with the source code for the Kurier software.  Therefore, Opek never

obtained the rights to the Kurier-4 source code.[2]

      31.    Kurier-4 was completed in March 2011 and launched June 27, 2011.

### III.    FedEx's Acquisition of Opek

      32.    In and around the year 2011, and as reflected in FedEx's annual reports, FedEx

implemented a corporate strategy of aggressively growing its international business.  Among

other transactions, FedEx acquired courier businesses in France and Brazil.  FedEx desired to

expand its business into Poland and needed to acquire a company with its own software system

to do so.  This is due to the fact that FedEx (unlike some of its competitors) does not have a

single, global software system capable of running its international courier businesses; rather,

FedEx relies on acquiring companies that already have operating systems in place.  After an

acquisition, FedEx uses that company's system to continue operating the courier business in that

country.  FedEx's international acquisitions generally followed this approach and were finalized

very quickly.

      33.    In or around August of 2011, approximately one month after the launch of the

Kurier-4 software, FedEx expressed an interest in acquiring Opek and negotiations and due

diligence ensued.  FedEx largely appeared to be acting through Erwin A. Raeth, a senior board

---

[2] In June 2013 Opek and Amur entered into a Settlement Agreement to settle disputes between
them arising out of this transaction, including their dispute over the termination of the 2010
License Agreement.  Pursuant to that Settlement Agreement, Opek was granted a new license for
the use of the Kurier-4 software that adopted most of the same restrictions included in the 2010
License Agreement and did not provide Opek any rights in the Kurier-4 source code.  The
Settlement Agreement is solely between Opek and Amur and only governs Opek's right to use
the Kurier-4 software, and is therefore not determinative of the present dispute.

member from FedEx's Memphis, Tennessee headquarters.  Upon information and belief, FedEx was interested in acquiring Opek based on its successful courier business and upon the mistaken belief that Opek owned the Kurier system that was the backbone of its courier operations.

34.     Initially, Mr. Kędzierski was invited to and did participate in negotiations with FedEx.  Mr. Kędzierski took part in an initial meeting in August 2011 between FedEx and Opek to describe the functionality of the new Kurier-4 system.

35.     After the initial meeting, FedEx demanded a subsequent meeting with Mr. Kędzierski solely concerning the Kurier software.  At this meeting, Mr. Kędzierski provided FedEx with requested information regarding the functionality of the Kurier software and the agreements between Amur and Opek regarding the development, use, and ownership of the Kurier software.  It became apparent to Mr. Kędzierski that FedEx had made incorrect assumptions about the ownership of the Kurier software.  Mr. Opinski, Mr. Kędzierski, and FedEx's legal advisor argued over the ownership of the Kurier software, with Mr. Opinski asserting all rights to the software and Mr. Kędzierski disputing any ownership by Mr. Opinski or Opek.

36.     An additional conference was held by video in September 2011 between Mr. Kędzierski and IT personnel and, upon information and belief, in-house legal counsel from FedEx's headquarters in the United States.  The issue between Mr. Kędzierski, Mr. Opinski, and FedEx's legal advisor over the ownership of the Kurier software was never resolved, although FedEx was provided with all the information necessary to determine that Plaintiffs retained full ownership rights to the Kurier software and had provided Opek only with a license to use the software.

37.     After the September video conference, Mr. Opinski represented to Mr. Kędzierski that FedEx had "gone quiet."  In reality, Mr. Opinski was continuing negotiations with FedEx, but FedEx and Mr. Opinski were intentionally excluding Mr. Kędzierski from the negotiations, apparently on FedEx's mistaken belief at this time that Opek had sufficient rights in the Kurier software to warrant continued discussions.  However, during this period of negotiations and due diligence, FedEx knew or should have known about the contracts and relationship between Plaintiffs and Opek and/or Mr. Opinski.  At a minimum, FedEx was aware that Plaintiffs claimed to retain all ownership over the Kurier software, and had been provided with the documents proving their ownership.  Based on this alone, FedEx should have recognized that Mr. Kędzierski should have been involved in these negotiations.

38.     In January 2012, unbeknownst to Plaintiffs at that time, Opek was sold into a Cyprus shell company for purposes of facilitating a tax-advantaged acquisition by FedEx.

39.     In or around March 2012, again unbeknownst to Plaintiffs at that time, FedEx conducted a third and final audit of Opek, which evaluated Opek's assets at PLN 4 million (approximately $1.3 million).  After this third audit, Opek entered into a preliminary agreement with FedEx.  Only after Opek and FedEx entered into the preliminary agreement did Mr. Opinski disclose to Mr. Kędzierski that negotiations had been continuing.

40.     On May 7-9, 2012, FedEx held a meeting with Opek, which Mr. Kędzierski was invited to attend.  At the meeting there was considerable confusion over whether FedEx's purchase price for Opek included the cost of having Amur integrate the Kurier system into FedEx's system.  Mr. Kędzierski made it clear that FedEx was not purchasing the Kurier software in its purchase of Opek, but offered to sell the Kurier software as part of the transaction. Mr. Kędzierski continued to have the expectation that FedEx would buy either Amur or the

Kurier software as part of the Opek acquisition or after its acquisition of Opek was completed. Mr. Kędzierski also provided FedEx with additional information regarding the Kurier software at this meeting, at FedEx's request. FedEx, for example, asked whether the Kurier software could be developed to work in another country in which FedEx was acquiring a separate courier company. Mr. Kędzierski responded that it could. Mr. Kędzierski noted that FedEx's IT personnel were asking very detailed technical questions, which indicated to Mr. Kędzierski that Mr. Opinski had likely already provided FedEx with confidential business information about the Kurier software.

41.  FedEx completed its acquisition of Opek in June 2012, purchasing Opek for PLN 188,463,240, approximately $54 million. Opek became a wholly-owned subsidiary of FedEx and is operated under the name FedEx Express Polska. Plaintiffs were cut out of the deal. And, despite continued assurances by Mr. Opinski that FedEx would contact Mr. Kędzierski regarding a purchase of the Kurier software or an acquisition of Amur, neither Amur nor the Kurier software were ever sold to FedEx. The sale of Opek without a corresponding sale of Amur or its Kurier software constituted a breach of the 1999 Agreement between Mr. Kędzierski and Mr. Opinski.

42.  Opek—whether valued by its assets or as a "going concern"—did not warrant its $54 million purchase price. By comparison, FedEx purchased another courier company, TATEX, at about the same time for a similar price despite TATEX's much greater profitability. Upon information and belief, and based on the substantial discrepancy (over $52 million) between the March 2012 valuation and Opek's ultimate purchase price, FedEx significantly overpaid for Opek to convince Opek and/or Mr. Opinski to intentionally cut Amur and Mr. Kędzierski out of the deal so that FedEx could misappropriate the Kurier software without

paying Plaintiffs for it.  The premium FedEx paid to Opek to gain access to and misappropriate the Kurier software was, upon information and belief, significantly less than FedEx would have had to pay for the Kurier software if it had purchased it from Plaintiffs.  Furthermore, by misappropriating the Kurier software through a side deal with Opek and/or Mr. Opinski, FedEx did not have to resolve the dispute between Opek and Plaintiffs over the ownership and other rights to the software and avoided the delay and other transaction costs in continuing to negotiate with Plaintiffs.

43.     Alternatively, upon information and belief, FedEx paid a significant amount of money (over $52 million) for the Kurier software to the wrong party (Opek) based on FedEx's mistaken belief that it was obtaining full rights in the Kurier software through its acquisition of Opek.  FedEx, through its agents, admitted as much during post-closing meetings with Plaintiffs in Poland.  For instance, shortly after the close of the transaction, an attorney for FedEx flatly stated that FedEx would not pay Plaintiffs for IT services or a license fee for using the Kurier system because "FedEx will not pay twice for something it has already purchased."  Moreover, during an August 1, 2012 meeting between Plaintiffs and FedEx—attended by U.S.-based FedEx employees Michael Foster and Cisco Sanchez—FedEx, through its agents, represented that it had purchased not only Opek but also Amur's IT services and the Kurier system.

44.     Regardless of its true motives, FedEx has now, upon information and belief, wrongfully obtained the Kurier-4 source code from Opek and has provided it to its new IT service provider, a company called Siòdemka, to make further developments to or further integrate the Kurier-4 software into FedEx's system.  Siòdemka is Amur's competitor.  This is in violation of Amur's sole ownership of the Kurier-4 source code.  Further, FedEx has, upon information and belief, distributed the Kurier-4 software to its affiliated entities for their use.

14

This violates Amur's license of the software to Opek only, without the right to grant further licenses or sublicenses.

45.     Plaintiffs have been significantly injured by FedEx's actions.  Amur and/or the Kurier software were not sold to FedEx along with Opek, but FedEx has obtained the Kurier-4 source code and has used the Kurier-4 software without paying Plaintiffs for those benefits.  As a result, Plaintiffs have been unable to recoup the costs of providing services to Opek at reduced rates for more than 12 years, which they did based on their agreements with Mr. Opinski that they would share in the success and acquisition of Opek.  Further, the value of the Kurier software has been diminished by millions of dollars, as it was specifically designed for Opek's courier business and does not have the same value outside of that context.

## CLAIMS FOR RELIEF

### COUNT I
*Tortious Interference with Contract in Violation of Tenn. Code Ann. § 47-50-109 and/or in violation of Tennessee Common Law*

46.     Plaintiffs incorporate by reference the preceding paragraphs as though fully set forth herein.

47.     Plaintiffs entered into several contracts with Opek and/or Mr. Opinski throughout their relationship, including (1) the 1999 Agreement in which Mr. Opinski promised that Amur or its Kurier software would be sold along with any sale of Opek and that Mr. Kędzierski would participate in any such sale negotiations, (2) the various licensing agreements governing Opek's use and preserving Plaintiffs' ownership of the Kurier software, and (3) the 2010 License Agreement providing for the continued provision of IT services by Amur.

48.     FedEx became aware of these contracts between Plaintiffs and Opek and/or Mr. Opinski during the due diligence and negotiations for its acquisition of Opek.

49.     FedEx desired to obtain the Kurier software along with its acquisition of Opek. Upon information and belief, to avoid having to pay Plaintiffs the full value for the Kurier software and/or to avoid having to acquire Amur, FedEx persuaded Mr. Opinski to exclude Mr. Kędzierski from the negotiations for the sale of Opek in breach of the 1999 agreement. Alternatively, upon information and belief, FedEx induced Opek and/or Mr. Opinski to breach the 1999 Agreement with Plaintiffs by paying Opek and/or Mr. Opinski tens of millions of dollars above the value of Opek, as evidenced by the overpayment of approximately $52 million.

50.     Further upon information and belief, FedEx induced Opek to provide it with the Kurier-4 software and source code in violation of the limited license to Opek and the various agreements maintaining Amur's sole and complete ownership of the Kurier-4 source code. FedEx has also, upon information and belief, provided this source code to Amur's competitor to obtain further development and integration of the software, in violation of Mr. Kędzierski's rights.

51.     Finally, upon information and belief, FedEx induced Opek to terminate the 2010 License Agreement early, in violation of the terms of that agreement.

52.     Upon information and belief, FedEx intended to cause Opek and/or Mr. Opinski to breach their agreements with Plaintiffs, or was substantially certain that its actions during the acquisition of Opek would cause the breach of those agreements.  This was not in Opek's best interests.  Opek had for years been operating successfully through its partnership with Plaintiffs and its use of the Kurier software.

53.     Plaintiffs have been significantly injured—in the tens of millions of dollars—by the breaches of these various agreements.  Amur and/or the Kurier software were not sold to FedEx along with Opek, and FedEx has obtained the Kurier-4 source code and has used the

Kurier-4 software without paying Plaintiffs for those benefits.  As a result, Plaintiffs have been unable to recoup the costs of providing service to Opek at reduced rates for more than 12 years, which they did based on their 1999 Agreement with Mr. Opinski that they would share in the success and acquisition of Opek.  Further, the value of the Kurier software has been diminished greatly, as it was specifically designed for Opek's courier business and has very limited value outside of that context.

54.	FedEx tortiously induced these breaches by Opek and/or Mr. Opinski in violation of Tennessee statutory and/or common law.

55.	As a result of FedEx's unlawful conduct, Plaintiffs have been damaged in an amount to be determined at trial.

56.	Plaintiffs are entitled to treble damages pursuant to Tenn. Code Ann. § 47-50-109.

57.	In the alternative to treble damages, FedEx's actions in interfering with Plaintiffs' contracts were intentional, malicious, or reckless, entitling Plaintiffs to punitive damages in an amount to be determined at trial.

### COUNT II
*Tortious Interference with Business Relationship*

58.	Plaintiffs incorporate by reference the preceding paragraphs as though fully set forth herein.

59.	Plaintiffs have had a business relationship with Mr. Opinski and Opek since 1999.

60.	FedEx became aware of this relationship between Plaintiffs and Opek and/or Mr. Opinski during the due diligence and negotiations for its acquisition of Opek.

61.	Upon information and belief, FedEx improperly desired to obtain the Kurier software without spending the additional time and incurring the additional costs of dealing with Mr. Kędzierski and/or acquiring Amur.  To accomplish this improper goal, upon information and

17

belief, FedEx wrongfully sought to destroy the relationship between Plaintiffs and Mr. Opinski/Opek, and FedEx used improper means to secure that outcome.

62.     Plaintiffs have been significantly damaged by FedEx's actions in causing Mr. Opinski and/or Opek to terminate this relationship.  Kurier's value was in its seamless operation of Opek's courier business.  During the many years that Mr. Kędzierski was designing and revising the Kurier software, Mr. Opinski unfailingly represented that the Kurier software goes "hand in hand" with Opek and that Opek would not be sold without a corresponding sale of the Kurier software.  Based on these representations and his 1999 Agreement with Mr. Opinski, Mr. Kędzierski specifically designed the software to be integrated into Opek's courier business, and saw no need to design Kurier to function as a standalone product.  Consequently, the value of the Kurier software is substantially reduced once separated from Opek.

63.     Moreover, Plaintiffs provided Opek with additional services at no or reduced cost for years in order to develop and expand Opek's courier business with the expectation that they would share in its success.  Due to FedEx's wrongful actions in destroying their relationship with Opek and Mr. Opinski, Plaintiffs have been excluded from those legitimately expected benefits.  Plaintiffs have further lost the value of their continued provision of IT services and software development to Opek due to FedEx's unlawful conduct in interfering with Plaintiffs' relationship with Opek.

64.     FedEx thus tortiously interfered with the business relationships between Plaintiffs and Mr. Opinski and/or Opek in violation of Tennessee common law.

65.     This interference was not in Opek's best interests.  Opek had for years been operating successfully through its partnership with Plaintiffs and its use of the Kurier software.

66.     As a result of FedEx's unlawful conduct, Plaintiffs have been damaged in an amount to be determined at trial.

67.     FedEx's actions in interfering with Plaintiffs' relationship with Opek and Mr. Opinski were intentional, malicious, or reckless, entitling Plaintiffs to punitive damages in an amount to be determined at trial.

**COUNT III**
*Civil Conspiracy*

68.     Plaintiffs incorporate by reference the preceding paragraphs as though fully set forth herein.

69.     Upon information and belief, FedEx and Mr. Opinski/Opek conspired wrongfully to exclude Plaintiffs from the benefits of the sale of Opek.  FedEx also conspired with Opek and/or Mr. Opinski to use the Kurier software without the requisite licenses or ownership, and to obtain the Kurier-4 source code in violation of Mr. Kędzierski's rights in that software.  Finally, FedEx and Mr. Opinski/Opek conspired to breach Opek's and/or Mr. Opinski's agreements with Plaintiffs.

70.     The actions of FedEx and Mr. Opinski were in breach of Mr. Opinski's and Opek's agreements with Plaintiffs.  Specifically, upon information and belief, FedEx caused Opek and/or Mr. Opinski to violate the various agreements providing for Plaintiffs' retention of the ownership of the Kurier software.  FedEx further caused Opek to terminate the 2010 License Agreement early, in violation of that Agreement, which required Opek to use Plaintiffs' IT services through December 2015.  Finally, FedEx caused Opek and/or Mr. Opinski to breach the 1999 Agreement pursuant to which Mr. Opinski promised that Mr. Kędzierski would participate in any negotiations for the sale of Opek, and that the Kurier system and/or Amur would be sold along with Opek.

71.     Plaintiffs have been damaged by the actions of FedEx and Mr. Opinski.  FedEx has not purchased either Amur or the Kurier software from Mr. Kędzierski.  The Kurier software's value has also been diminished by millions of dollars as it was created to work specifically in conjunction with Opek's courier business.  Finally, Plaintiffs have lost the value of their continued provision of IT and software development services to Opek.

72.     As a result of FedEx's unlawful conduct, Plaintiffs have been damaged in an amount to be determined at trial.

73.     FedEx's actions in conspiring with Opek and/or Mr. Opinski were intentional, malicious, or reckless, entitling Plaintiffs to punitive damages in an amount to be determined at trial.

**COUNT IV**
*Unjust Enrichment*

74.     Plaintiffs incorporate by reference the preceding paragraphs as though fully set forth herein.

75.     There is no contract between Plaintiffs and FedEx presently governing FedEx's use of the Kurier software.

76.     During the early negotiations for FedEx's acquisition of Opek, Mr. Kędzierski provided FedEx with detailed information regarding the Kurier software in furtherance of FedEx's ultimate purchase of the rights to use the Kurier software or purchase of Amur as the owner of the Kurier software.

77.     Instead, FedEx neither purchased Amur nor the Kurier software, but rather used information provided by Mr. Kędzierski during the initial negotiations, and, upon information and belief, information provided to FedEx by Mr. Opinski, to use the Kurier software and its source code without the right to do so.

20

78.     FedEx reasonably should have known that it did not acquire the rights to use the Kurier software through its purchase of Opek based on its own due diligence and on the information provided to FedEx by Mr. Kędzierski, and that it would need to compensate Mr. Kędzierski and/or Amur for the use of that software.  However, rather than paying Plaintiffs the full amount to legally acquire all rights to the Kurier software, upon information and belief FedEx instead paid additional money to Opek and/or Mr. Opinski to secure their help in excluding Plaintiffs from the transaction and wrongfully obtaining the information needed to use the Kurier software.

79.     Upon information and belief, FedEx continues to use the Kurier software and has provided the Kurier-4 source code to Amur's competitor for further development of the software and/or further integration of the software into FedEx's systems.  Alternatively, upon information and belief, FedEx provided the Kurier source code to Amur's competitor, Siòdemka, in order to allow Siòdemka to create a new software for FedEx to use in place of the Kurier software.

80.     It would be unjust to allow FedEx to continue using the Kurier software without purchasing the software or the license to use it.

81.     FedEx has been unjustly enriched as a result of its unlawful conduct in using and pursuing further development and integration of the Kurier software without the right to do so. As a result of FedEx's unlawful actions, Plaintiffs have been damaged in an amount to be determined at trial.

82.     FedEx's actions in continuing to use the Kurier software are intentional, malicious, or reckless, entitling Plaintiffs to punitive damages in an amount to be determined at trial.

## COUNT V
*Aiding and Abetting Breach of Fiduciary Duty*

83.     Plaintiffs incorporate by reference the preceding paragraphs as though fully set forth herein.

84.     In 1999, Mr. Kędzierski and Mr. Opinski entered into a joint venture agreement to develop and sell Opek's courier business.  Mr. Opinski was to manage and control the general financial and business aspects of Opek, while Mr. Kędzierski handled the logistics and software.  Mr. Kędzierski's compensation for the provision of IT services for years was calculated as a percentage of Opek's monthly sales, and the license for the Kurier-3 software was free until Opek reached a certain level of yearly sales or was successfully acquired.

85.      Mr. Opinski and Mr. Kędzierski further agreed that the Kurier software would be sold alongside Opek such that each would share in the profits arising from Opek's success.

86.     Mr. Opinski and Mr. Kędzierski operated pursuant to these agreements to further the joint venture from 1999 until FedEx sought to acquire Opek in 2011.

87.     As a joint venturer, Mr. Opinski owed Plaintiffs fiduciary duties of loyalty and care in accordance with the Tennessee Revised Uniform Partnership Act, Tenn. Code Ann. § 61-1-404.

88.     Mr. Opinski breached his duties of care and loyalty in wrongfully excluding Mr. Kędzierski from the negotiations for the sale of Opek and cutting Amur and the Kurier software out of the sale.

89.     Throughout the due diligence period associated with FedEx's purchase of Opek, FedEx studied the agreements and relationships between Mr. Opinski/Opek and Plaintiffs, and knew or should have known that those parties were engaged in a joint venture relationship such that Mr. Opinski owed fiduciary duties to Plaintiffs.  Upon information and belief, FedEx

22

substantially assisted and encouraged Mr. Opinski's breach of his fiduciary duties to Mr. Kędzierski by excluding Mr. Kędzierski from the negotiations.  Upon information and belief, FedEx also paid Mr. Opinski/Opek millions of dollars over and above the value of Opek to encourage Mr. Opinski to exclude Plaintiffs from the transaction in violation of his fiduciary duties to Plaintiffs.  FedEx also, upon information and belief, paid Mr. Opinski/Opek millions of dollars to encourage Mr. Opinski to provide FedEx with information, including the Kurier source codes, sufficient to allow FedEx to use the Kurier software beyond its right to do so, which was further in breach of Mr. Opinski's fiduciary duties to Plaintiffs.

90.     FedEx therefore aided and abetted Mr. Opinski's breaches of his fiduciary duties.

91.     As a result of FedEx's unlawful actions, Plaintiffs have been damaged in an amount to be determined at trial.

92.     FedEx's actions in inducing Mr. Opinski to breach his fiduciary duties were intentional, malicious, or reckless, entitling Plaintiffs to punitive damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request as follows:

A.     For judgment in favor of Plaintiffs and against Defendants for:

(1) tortious interference with contract in violation of Tennessee Code § 47-50-109 or in violation of Tennessee common law;

(2) tortious interference with business relationship in violation of Tennessee common law;

(3) civil conspiracy in violation of Tennessee common law;

(4) unjust enrichment in violation of Tennessee common law;

23

(5) aiding and abetting a breach of fiduciary duty in violation of Tennessee

common law;

B.        For monetary damages in an amount to be determined by a jury at trial;

C.        For punitive damages in an amount to be determined by a jury pursuant to

Tennessee Code § 29-39-104;

D.        For treble damages pursuant to Tennessee Code § 47-50-109;

E.        For a jury trial as to issues of fact in this matter;

F.        For an award of attorneys' fees, costs, and expenses in pursuing this action; and

G.        For such further relief, at law or in equity, as the Court deems just and proper.


Respectfully submitted this the  10th  day of  February, 2015.


                        /s/ Tyler Scarbrough
                        Tyler Scarbrough (TN Bar No. 028521)
                        Kilpatrick Townsend & Stockton LLP
                        1100 Peachtree Street NE
                        Suite 2800
                        Atlanta, GA 30309-4528
                        (404) 815-6342
                        tscarbrough@kilpatricktownsend.com

                        Chad D. Hansen (NC Bar No. 32713), *pro hac vice pending*
                        Elizabeth L. Winters (NC Bar No. 44918), *pro hac vice pending*
                        Kilpatrick Townsend & Stockton LLP
                        1001 West Fourth Street
                        Winston-Salem, NC 27101-2400
                        (336) 607-7345
                        chansen@kilpatricktownsend.com
                        bwinters@kilpatricktownsend.com